UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DWIGHT KEPLER MILLER, JR.

        Plaintiff,

vs.

COREWELL HEALTH, a Michigan Domestic Non-Profit Corporation, d/b/a COREWELL HEALTH BEAUMONT TROY HOSPITAL,

        Defendant.
_____/

Case No.
Hon.
Magistrate Judge

**COMPLAINT AND DEMAND FOR JURY TRIAL**

James C. Baker (P62668)
Attorney for Plaintiff
STERLING ATTORNEYS AT LAW, P.C.
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, MI 48304
(248) 644-1500
jbaker@sterlingattorneys.com
_____/

## COMPLAINT AND JURY DEMAND

Plaintiff Dwight Kepler Miller, Jr. by his attorney James C. Baker (P62668) of Sterling Attorneys at Law, P.C., for his Complaint and Jury Demand submits the following:

### JURISDICTIONAL ALLEGATIONS

1. Plaintiff is an individual residing in Sterling Heights, Michigan, within the Eastern District of Michigan.

2. Defendant Corwell Health d/b/a Corewell Health Beaumont Troy Hospital ("Corewell") is a Michigan domestic non-profit corporation, with its corporate headquarters in Grand Rapids, Michigan, and which conducts business via several locations within the Eastern District of Michigan.

3. The events underlying this lawsuit occurred in, and arose out of Plaintiff's employment at Defendant's hospital facility located in Troy, Michigan, within the Eastern District of Michigan.

4. Plaintiff brings this action pursuant to the National Labor Relations Act of 1935 ("NLRA"), 29 USC 151 *et seq.*, as well as through applicable, non-preempted state law claims.

5. Plaintiff was an employee of Defendant, defined by the NLRA, 29 USC 152(3).

6. Defendant is an employer defined by the NLRA, 29 USC 152(2).

7. This Court has federal question jurisdiction under 28 USC 1331 because this action arises under the laws of the United States.

8. This Court has supplemental jurisdiction over plaintiff's state law claim under 28 USC 1367(a).

9. Venue is proper in this district under 28 USC 1391(a)(2), (b)(1), and (b)(2) because all or substantial parts of the events giving rise to the claim occurred in this District, and Plaintiff and Defendant reside in this District.

10. Plaintiff's termination was retaliation for opposing Defendant's conduct that violated the NLRA; he timely files this Complaint within 180 days thereafter.

## GENERAL ALLEGATIONS

11. Defendant Corewell operates a hospital in Troy, Michigan, among other places, wherein Plaintiff was employed.

12. Plaintiff enjoyed a nine (9) year career with Corewell, serving as a Security Department Supervisor.

13. Corewell terminated Plaintiff's employment on June 13, 2024.

14. Throughout his employment with Corewell, Plaintiff was a dedicated and loyal employee with a successful track-record of performance.

15. Corewell's actions leading up to and including the termination violated the NLRA, and was in violation of federal, state, and common law, and public policy.

### *The events leading up to Plaintiff's termination.*

16. On April 24, 2024, Corewell instructed its Security Management Team, including Plaintiff as a Supervisor, to engage in activities to monitor employees at the Troy facility, and report union-organizing activities to Corewell's leadership.

17. The day before, Corewell's Security Department Manager ordered Plaintiff to spy on employees who were looking to unionize.

3

18. During the April 24th meeting, Plaintiff openly opposed the order, stated the activities would violate the NLRA, and he informed leadership he was in favor of unionizing.

19. It was this opposition that began adverse treatment culminating in his termination on June 13.

20. For example, after that meeting, Corewell's Security Department Director treated Plaintiff differently, as if their relationship had chilled.

### *Pretext for retaliation and termination.*

21. Corewell will likely claim its decision to terminate Plaintiff was the result of a security incident involving Plaintiff.

22. On June 3, 2024 at approximately 11:30 p.m., there was an incident whereby a disorderly male was in the Emergency Center's lobby.

23. Plaintiff responded to an officer's request for assistance.

24. During the incident, a 34-year-old male of athletic build and six feet two inches tall, purposefully breached two restricted areas within Corewell's Troy medical facility.

25. The man's actions were combative, causing chaos and fear among Corewell's staff, patients, and visitors.

26. When approached by security personnel, the individual became verbally abusive, and his conduct escalated to threats of physical violence.

27. He assaulted security staff, and there existed the very real and imminent threat of physical battery on Corewell staff.

28. Staff, including Plaintiff, physically restrained the individual, during which he physically battered security staff including Plaintiff.

29. During the attack, an informed decision arose to employ the use of a Taser to help subdue the violent attacker.

30. The actions were meant to curtail the physical violence occurring.

31. The actions did cease the assault; thereafter, the Troy Police Department arrived and controlled the circumstances.

32. At all times during the violent melee, Plaintiff and security staff were aware of Corewell's Use of Force Policy.

33. The force used was appropriate pursuant to that policy.

34. The factors considered when using the force employed included the individual breaching secured areas in the facility, causing fear, chaos, abuse, threat of immediate battery, battery, the size of the individual involved, and that there was the threat of immediate danger, with immediate danger ensuing.

35. Plaintiff was aware the aggressor had been expelled from the Troy campus just two days prior for abusive and assaultive behaviors.

***Corewell's actions after the incident.***

36. On June 4, 2024, Plaintiff was suspended.

37. On June 7, the Security Department Manager told Plaintiff his suspension was until June 14, and the suspension was his punishment.

38. Plaintiff inquired how there could be punishment without any investigation.

39. The Manager reiterated the suspension was the final punishment, and that Plaintiff was to return to work on June 15, 2024.

40. On or about June 7 or 8, Plaintiff met with the Security Department Director and the Security Department Manager.

41. They discussed the circumstances of the June 3rd event, during which time the Director told Plaintiff she had not made any decision on the punitive action against him.

42. Plaintiff reminded her of his suspension without pay from June 4 to June 14, which was to be his final punishment.

43. He looked to the Manager for confirmation; neither the Director nor the Manager addressed Plaintiff further.

*Corewell's leadership fails to investigate and influences staff against Plaintiff.*

44. On June 12, the Security Department Manager was speaking to other security officers about Plaintiff, trying to influence the other security officers to support Dwight Miller's termination.

45. This was despite the Security Manager telling Plaintiff the suspension was his punishment, and that he was to return to work on June 15.

6

46. The Security Department Manager was the same individual who, just weeks earlier on April 23rd, had ordered Plaintiff to spy on Corewell staff and their union discussions.

47. It was to this Manager and others that Plaintiff verbally expressed his opposition to that order, that he was pro-union, and that the order was a labor law violation.

48. Plaintiff discovered that Corewell had not tasked its veteran Investigator to investigate the events of June 3rd.

49. This contradicted Corewell's Security Department protocols.

50. Plaintiff also discovered that Corewell did not interview witnesses to the events of June 3rd; these medical staff would corroborate the events reported by Plaintiff and the other security staff that responded to the violence.

51. Corewell also falsified portions of Plaintiff's reporting, and wrongly attributed that he gave "orders to use a taser" to Plaintiff.

52. Had there been a proper investigation, the truth would have been discovered; namely, it was a subordinate officer that had employed the use of his taser while the offender was physically battering that officer, Plaintiff, and the nurse who was attempting to place the aggressor in neoprene restraints.

53. Prior to the subordinate officer using that level of force, Plaintiff had appropriately warned the aggressor of the potential use of a taser, and thereafter the offender became more aggressive.

### *The evidence supports the termination was retaliatory.*

54. Evidence supports termination was retaliation against Plaintiff.

55. June 3rd was the first time Plaintiff was accused of anything remotely close to a policy violation.

56. There was no basis to suspend a Supervisor without pay.

57. Terminating an employee the way it terminated Plaintiff is a deviation from Corewell's progressive discipline policy.

58. Corewell refused to conduct a proper investigation.

59. Corewell refused to allow Plaintiff appeal his termination.

### *There is a temporal connection between the events complained of.*

60. Mere days after Plaintiff opposed Corewell's violations of the NLRA, the Security Director and Manager went out of their way to specifically inform Plaintiff of the results of the vote to unionize the Security Department.

61. The Security Department Director and Manager acted gleefully, as if taunting Mr. Miller.

62. Plaintiff's conduct resulted in a negative change to his relationship with Defendant's senior leadership.

### *Plaintiff's termination was retaliatory, as was Corewell's conduct thereafter.*

63. Plaintiff engaged in activity protected by the NRLA.

64. Defendant was aware Plaintiff engaged in protected activity.

65. Defendant retaliated against Plaintiff because he engaged in protected activity.

66. On June 13, 2024, Plaintiff's 9-year career with Defendant involuntarily ended because he engaged in activity protected by the NLRA.

67. After termination, Plaintiff applied for, and he was offered a security position with University of Michigan Health ("Michigan Health").

68. Nearing his start date, Plaintiff learned Michigan Health had spoken with representatives of Defendant who told Michigan Health of the pretextual reasons Defendant claimed to have terminated Plaintiff.

69. On information and belief, the representatives warned Michigan Health about Plaintiff's feelings toward unions, as well as his opposition to Corewell's order to spy on unionizing activities at Corewell's Troy hospital.

70. Thereafter, Michigan Health did not employ Plaintiff.

71. Other than Defendant's retaliation, there was no other reason to deny Plaintiff employment with Michigan Health.

72. As a direct and proximate result of Defendant's conduct, he lost his career with Defendant, and the benefits therefrom, and was denied a career with Michigan Health, and the benefits flowing from that employment opportunity.

## COUNT I
## RETALIATION VIOLATING THE NLRA

73. Plaintiff incorporates the preceding paragraphs by reference.

9

74. At all applicable times hereto, Plaintiff was not a member of a labor union; however, the conduct complained of while Plaintiff was employed is conduct governed by the National Labor Relations Act.

75. Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively … and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or activities," as well as the right "to refrain from any or all such activities." 29 USC 157.

76. Section 8(a)(1) of the NLRA makes it illegal for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed under Section 7." 29 USC 158(a)(1).

77. Section 8 also prohibits spying on employees' union activities; spying means to do something out of the ordinary to observe the employees' union activities, including activities to discuss forming a union. 29 USC 158.

78. Section 8(a)(3) prohibits discrimination regarding any condition of employment to encourage or discourage membership in any labor organization. 29 USC 158(a)(3).

79. Section 8(a)(4) prohibits an employer from discharging an employee because of conduct protected by the NLRA. 29 USC 158(a)(4).

80. Defendant violated the NLRA by interfering with employees in the exercise of rights provided for by the NRLA.

81. Defendant violated the NRLA by ordering Plaintiff to spy on and report co-workers for engaging in conduct protected by the NLRA.

82. Defendant violated the NLRA by discriminating and retaliating against Plaintiff for opposing the spying order, as well as expressing his preference for unionization.

83. Defendant violated the NLRA by wrongfully terminating Plaintiff's employment for the protected conduct alleged herein.

84. The actions of Defendant by its agents were deliberate and intentional, and engaged in with malice, or with reckless indifference to the rights and sensibilities of Plaintiff.

85. As a direct and proximate result of Defendant's wrongful, discriminatory, and retaliatory treatment of Plaintiff, Plaintiff has suffered injuries and damages, including but not limited to, loss of past, present and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional distress, including anxiety and mental anguish, humiliation and embarrassment; and the loss of the ordinary pleasures of everyday life.

## COUNT II
## RETALIATION IN VIOLATION OF PUBLIC POLICY
## ("PUBLIC POLICY TORT")

86. Plaintiff incorporates the preceding paragraphs by reference.

87. A public policy claim is appropriate if any of the following occurs: (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in the course of employment; or (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment.

88. Plaintiff was discharged from Defendant's employment.

89. The discharge was in violation of the NLRA's express legislative statement prohibiting discharge for employees who act in accordance with the rights afforded them under the statute.

90. Plaintiff refused to violate the law by refusing to spy on his co-workers; spying of this type violates the NRLA.

91. Plaintiff had a right to oppose Defendant's illegal orders, and was discharged for his opposition.

92. Defendant's termination decision was retaliation in violation of Michigan public policy.

93. As a direct and proximate result of Defendant's wrongful and retaliatory treatment of Plaintiff, Plaintiff has suffered injuries and damages, including but not limited to, loss of past, present and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional

distress, including anxiety and mental anguish, humiliation and embarrassment; and the loss of the ordinary pleasures of everyday life.

## COUNT III
## TORTIOUS INTEFERENCE WITH AN ECONOMIC OPPORTUNITY

94. Plaintiff incorporates the preceding paragraphs by reference.

95. Defendant further retaliated by interfering with Plaintiff's opportunity for employment.

96. An economic opportunity for employment existed between Plaintiff and University of Michigan Health.

97. The economic opportunity was valid; Plaintiff was scheduling his start date with his new employer when Defendant interfered.

98. Defendant knew and/or became aware of Plaintiff's opportunity with Michigan Health.

99. Defendant purposefully and wrongfully disrupted Plaintiff's relationship with Michigan Health, thereby disrupting the economic opportunity Plaintiff was soon to enjoy.

100. Defendant's interference with Plaintiff's economic opportunity caused harm to Plaintiff's opportunity.

101. As a direct and proximate result of Defendant's wrongful interference with Plaintiff's economic opportunity, Plaintiff has suffered injuries and damages, including but not limited to, loss of past, present and future

earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional distress, including anxiety and mental anguish, humiliation and embarrassment; and the loss of the ordinary pleasures of everyday life.

WHEREFORE Plaintiff Dwight Kepler Miller, Jr., by his attorney James C. Baker of Sterling Attorneys at Law, P.C., respectfully requests that this Honorable Court enter judgment against Defendant Corewell Health d/b/a Corewell Health Beaumont Troy Hospital in whatever amount Plaintiff is found to be entitled, together with compensatory and exemplary damages, back and front pay (as reinstatement is not a reasonably-viable option under the circumstances), attorney fees and interest as an element of damages, statutory interest and attorney fees, and costs.

    Respectfully submitted,

    STERLING ATTORNEYS AT LAW, P.C.

    By:  /s/James C. Baker
        James C. Baker (P62668)
        Attorney for Plaintiff
        33 Bloomfield Hills Pkwy., Ste. 250
        Bloomfield Hills, MI 48304
        (248) 644-1500
        jbaker@sterlingattorneys.com

Dated: September 20, 2024

## JURY DEMAND

Plaintiff Dwight Kepler Miller, Jr., by his attorney James C. Baker of Sterling Attorneys at Law, P.C., respectfully demands a trial by jury.

Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By: /s/James C. Baker
    James C. Baker (P62668)
    Attorney for Plaintiff
    33 Bloomfield Hills Pkwy., Ste. 250
    Bloomfield Hills, MI 48304
    (248) 644-1500
    jbaker@sterlingattorneys.com

Dated: September 20, 2024